987 F.2d 142
 19 UCC Rep.Serv.2d 1148
 Sanford BRASS; Joyce Mericle Brass; Gustave E. Chew; Fred
Suther; John Tomaszewski; Stephen D.E. Mitchell, as
Trustee for Giles David Edwin Mitchell and Neville Arthur
Thomas Mitchell, Plaintiffs-Appellants,
v.
AMERICAN FILM TECHNOLOGIES, INCORPORATED, Defendant-Appellee.
 No. 37, Docket 92-7328.
 United States Court of Appeals, Second Circuit.
 Argued Sept. 4, 1992.
Decided March 8, 1993.
 
 Raymond A. Connell, New York City (Connell Losquadro & Zerbo, of counsel), for plaintiffs-appellants.
 Robert Knuts, New York City (Darrell K. Fennell, Fennell & Minkoff, of counsel), for defendant-appellee.
 Before: FEINBERG, NEWMAN and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This securities law action was brought against a defendant-corporation that was selling warrants for the purchase of its common stock. Plaintiff's suit alleging conversion, breach of contract and fraud arose when he met with defendant's chief executive officer to inquire about the business and ended up purchasing 65,000 of the warrants transferable into the company's common stock. Unknown to plaintiff, and untold by defendant's CEO, was the existence of a two-year holding period in which public trading of the common stock was prohibited. Despite the obvious effectiveness of defendant's sales pitch, the district court ruled in dismissing plaintiff's complaint that defendant had no duty to explain the restriction to plaintiff because of the absence of a fiduciary or other type of relationship between the parties that should have induced the plaintiff to rely on the CEO's investment advice.
 
 
 2
 Whatever validity the aphorism "speech is silver, silence is golden" may have in general, in this securities fraud action it should be restated to "speech is golden" because the CEO's silence broadcasted a misleading impression to plaintiff. To remain silent when one might have been supposed to speak is sufficiently alleged in the present complaint for plaintiff's suit to escape dismissal.
 
 BACKGROUND
 
 3
 Defendant, American Film Technologies, Incorporated (AFT), is a modern-day business that has developed a special process for adding color to black-and-white films. The plaintiff, Sanford Brass, was attracted to the company as an investment, though he had no prior knowledge of it, its plans, or the prospects for the colorizing industry in general. To learn something about the company he attended a meeting in April 1987 with George Jensen, AFT's chairman and chief executive, and with Dennis Abert, a consultant to the same firm. Jensen laid out the company's business plans and told plaintiff that AFT had warrants available that could be used to purchase AFT common stock, which was expected soon to rise in value. The warrants Jensen referred to were the 65,000 warrants that had been allocated to Abert, who was in need of cash.
 
 
 4
 Following this April meeting Brass agreed to buy 10,000 of Abert's warrants for $1 per warrant. Jensen confirmed the purchase in a letter dated May 7, 1987 that set out the material elements of the transaction, stating that the warrants were exercisable for a five-year period at $2 per share. According to plaintiff, neither the seller, Abert, nor Jensen told him that the warrants and the underlying common stock were part of a private placement and thus for two years were not freely transferrable. See Securities and Exchange Commission (S.E.C.) Rule 144, 17 C.F.R. § 230.144 (1992). Brass declares that had he known of the restriction he would not have purchased $10,000 worth of warrants.
 
 
 5
 Jensen continued to solicit Brass with respect to AFT securities. In July 1987 plaintiff received a Red Herring Preliminary Prospectus regarding the impending public offering of AFT common stock. The prospectus identified certain shares of common stock derived from the exchange of outstanding warrants as subject to a two-year resale limitation, without identifying precisely which shares were so restricted. Two years later plaintiff purchased the remaining 55,000 warrants allocated to Abert on the same basis as the original 10,000 warrants. In the summer of 1989 Abert faxed evidence to Brass of his entitlement to the warrants and included in the transmission a "Stock Purchase Right" certificate. Although this certificate did not disclose the restrictions on the common stock, it did state that the warrants were transferable only with AFT's approval, which AFT gave to allow Abert to sell his warrants.
 
 
 6
 In September 1989 AFT faxed at plaintiff's request a new Stock Purchase Right--similar to the one Brass received during the summer--certifying that Brass had the right to buy 65,000 shares of "unissued common stock." AFT insists that a letter accompanying the certificate disclosed the S.E.C. Rule 144 limitation on the sale of the common stock. Brass denies receiving the letter.
 
 
 7
 During early 1990 AFT warrants and common stock rose substantially in value on the Philadelphia Stock Exchange, prompting AFT to effect a two-for-one reverse stock split. This meant that plaintiff's warrants entitled him now to buy 32,500 shares of common stock. In April 1990 when AFT stock was selling at $9 per share and the warrants were trading at $5.50, Brass decided to distribute his warrants to his wife and several valued business colleagues (the transferees), who are now named plaintiffs. The transferees paid Brass the $65,000 he had paid Abert to acquire the warrants.
 
 
 8
 AFT consented to the transfer and sent Brass a revised Stock Purchase Right for 32,500 warrants, requesting him to list his transferees. In a letter accompanying this new Stock Purchase Right AFT informed Brass that "the warrants are now exercisable at four dollars ($4.00) per share," to reflect the reverse stock split, "and the common stock will remain restricted for two years after the date of exercise of the purchase rights." This, Brass avers, was the first notice he had that the warrants covered restricted shares of stock. On April 26, 1990 plaintiff signed the new Stock Purchase Right certificate and on the following day, AFT returned his old certificate marked "cancelled," and forwarded new certificates to the seven designated plaintiff transferees. On May 3, 1990 AFT sent a clarification letter to the transferees, disclosing that both the Stock Purchase Rights and the underlying common stock were issued as part of an AFT private placement. Thus, neither was freely tradeable.
 
 
 9
 On July 18, 1991 Brass and the transferees commenced the instant action against AFT in New York State Supreme Court alleging that defendant's actions constituted a wrongful conversion of the warrants, and of the right of Brass and his distributees to exercise the purchase option evidenced by those warrants. Plaintiffs demanded $290,550 damages. AFT removed the case to the United States District Court for the Southern District of New York on diversity grounds and made a Fed.R.Civ.P. 12(b)(6) motion to dismiss. The district court, Louis J. Freeh, Judge, converted that motion sua sponte to one for summary judgment. See Brass v. American Film Technologies, Inc., 780 F.Supp. 1001, 1002 (S.D.N.Y.1991).
 
 
 10
 In opposing summary judgment, plaintiffs asserted that AFT's conduct constituted conversion, breach of contract, securities fraud and common law fraud. To make out a conversion claim, Brass contended that he was entitled to receive unrestricted AFT common stock. He based this argument on U.C.C. § 8-204 and a Tenth Circuit case interpreting it. See Edina State Bank v. Mr. Steak, Inc., 487 F.2d 640, 644 (10th Cir.), cert. denied, 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974).
 
 
 11
 In an order dated December 18, 1991, the district court rejected Brass' conversion claims. It disagreed with the holding in Edina State Bank and did not think § 8-204 required issuers of securities to include notices regarding limitations on transfer arising under the federal securities laws. See Brass, 780 F.Supp. at 1004. It granted AFT summary judgment on the Brass contract claims as well, finding that the contract was between Brass and Abert, not between plaintiff and the defendant AFT. Id. Because there were relevant unresolved factual issues, both fraud claims were left in place and plaintiff was granted leave to amend his pleadings with respect to them. See id. at 1004-05.
 
 
 12
 Later plaintiffs filed an amended complaint pursuing only a claim for common law fraud, which AFT moved to dismiss. On February 28, 1992 the district court granted this motion because plaintiffs had failed to state a claim upon which relief could be granted under Rule 12(b)(6) and to plead fraud with sufficient particularity under Fed.R.Civ.P. 9(b). The trial court observed that plaintiffs had two fraud claims: fraudulent misrepresentation and fraudulent concealment. As to the Brass transferees, these plaintiffs had dealt only with Brass and not with AFT. Hence, they had no claim under either theory. With respect to Brass, there was no misrepresentation because the complaint never alleged that Jensen made false statements, and there was no case for concealment because AFT and Jensen were not in a fiduciary relationship with Brass and therefore had no duty to disclose restrictions. Following a motion by the plaintiffs, the district court reconsidered its December 18 decision with respect to plaintiffs' contract claim, and reaffirmed its prior ruling. Although it now agreed with Brass that the Stock Purchase Rights constituted a continuing offer by AFT to sell securities, it concluded that these rights created no contractual obligation to provide unrestricted stock to any party.
 
 
 13
 On March 6, 1992 judgment was entered dismissing the plaintiffs' amended complaint and all their claims against AFT. Plaintiffs appeal from the grant of summary judgment in favor of AFT on the conversion and contract claims and from the Rule 12(b)(6) dismissal of their fraud claims. We affirm as to the conversion claim, but reverse the contract and fraud rulings and remand the matter to the district court.
 
 DISCUSSION
 I Summary Judgment
 
 14
 To defeat AFT's motion for summary judgment dismissing the conversion and contract claims, plaintiffs must do more than demonstrate the existence of some metaphysical doubt as to the material facts, they are required to produce "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added in Matsushita ). Whether the trial court correctly concluded there was "no genuine issue as to any material fact," with respect to plaintiffs' conversion and contract claims, thereby entitling AFT to "judgment as a matter of law," see Fed.R.Civ.P. 56(c), is reviewed de novo to ensure that the substantive law was correctly applied. See National Union Fire Ins. Co. v. Turtur, 892 F.2d 199, 203 (2d Cir.1989). In analyzing the substantive law in the discussion that follows, New York law, which both parties agree controls, is applied.
 
 A. Conversion Claim
 
 15
 Plaintiffs contend that AFT's failure to provide them with Stock Purchase Rights covering unrestricted common stock constitutes a conversion under New York law of both the rights acquired from Abert and the common stock obtainable from AFT by the exercise of those rights. They believe they were entitled to have Stock Purchase Rights going to unrestricted stock because AFT failed to disclose those restrictions applicable to the common stock as required by U.C.C. § 8-204. That section provides: "[a] restriction on transfer of a security imposed by the issuer ... is ineffective against any person without actual knowledge of it unless ... the security is certificated and the restriction is noted conspicuously thereon." N.Y.U.C.C. § 8-204 (McKinney 1993). It imposes a "strict rule as to notice" to protect purchasers of securities, id. official uniform cmt. 2. The consequences of failure to give notice fall on the issuer because § 8-204 applies only to transfer restrictions imposed by the issuer. In contrast, S.E.C. Rule 144 may be read to imply that securities issued under a private placement not be publicly traded for two years from the date of acquisition from the issuer. See 17 C.F.R. § 230.144(d)(1) (1992); id. § 230.142. The Commercial Code makes no reference to restrictions imposed by any other law. A reading of § 8-204 as not including any possible restrictions arising out of SEC regulations is supported by its Official Commentary, which states that "[t]his section deals only with restrictions imposed by the issuer and restrictions imposed by statute are not affected." N.Y.U.C.C. § 8-204 official uniform cmt. 6.
 
 
 16
 Plaintiffs naturally take a contrary position. They rely primarily upon the Tenth Circuit's broad interpretation of the U.C.C. phrase "imposed by the issuer" to include as well restrictions arising out of the Securities Act of 1933. See Edina State Bank, 487 F.2d at 644-45. There it was held that a plaintiff bank was entitled to maintain a conversion action under Colorado's U.C.C. § 8-204 against a corporate issuer of privately placed securities that had not noted applicable Securities Act restrictions on its stock certificates. The corporation, Mr. Steak, had issued stock in a private offering to an individual named Price, who used the shares to secure a loan with the Edina Bank. When Price defaulted on his loan, the bank attempted to sell the stock it held as collateral, but was barred from doing so by the unlegended Securities Act restrictions on the shares. See id. at 642-43. The bank sued Mr. Steak and its transfer agent. The district court held for the defendants because the Edina Bank had failed to make any inquiry with the defendants, the S.E.C., or any brokers regarding the stock. See id. at 643-44. In reversing, the Tenth Circuit construed § 8-204's requirements of notice broadly and found that Mr. Steak had not fulfilled its obligations under the U.C.C., and determined that the protection of the statute "extended to all against an unnoted restriction." Id. at 644. The court, in so holding, reasoned that the restrictions arising out of the Securities Act applied only because Mr. Steak had chosen to offer its stock in a private placement, and thus the restriction was in effect "imposed by the issuer" within the meaning of § 8-204.
 
 
 17
 When the holding in Edina State Bank was cited to a Southern District judge in DeWitt v. American Stock Transfer Co., 440 F.Supp. 1084 (S.D.N.Y.1977)--involving a parallel Delaware U.C.C. provision--he refused to follow it. The district court reasoned that since no other case equated restrictions imposed by the issuer with those arising from the federal securities laws, the Edina State Bank rationale should not be extended beyond its facts, that is, a private placement by the issuer of its own securities. See id. at 1087.
 
 
 18
 Plaintiffs urge us to adopt Edina State Bank, which they think consistent with the S.E.C. policy of encouraging issuers of privately placed securities to make full disclosure of re-sale restrictions. See 17 C.F.R. § 230.502(d)(3) (1992); 3 Louis Loss & Joel Seligman, Securities Regulation 1491-99 (3d ed. 1989). Continuing, plaintiffs point out that even were we to embrace the limitations imposed by DeWitt, their conversion claim would still stand because it falls squarely within the factual context of Edina State Bank, that is, the stock in this case, like Mr. Steak's stock in that case, was issued as part of a private placement, and AFT, like Mr. Steak, had the exclusive opportunity to legend its own securities before issuing them.
 
 
 19
 In our view the instant case is distinguishable from Edina State Bank. Hence, we need not decide whether to adopt its reading of the "imposed by the issuer" language in U.C.C. § 8-204. Edina State Bank is inapt because there the bank received Mr. Steak common stock certificates without notice on their face of the restrictions. In the present case plaintiffs never exercised their Stock Purchase Rights and therefore never received any AFT common stock certificates. Thus, unlike Mr. Steak, AFT had no opportunity to legend its stock certificates and accordingly had no responsibility under § 8-204 to notify Brass--assuming such is a requirement--of the S.E.C. Rule 144 restrictions concerning its privately placed common stock.
 
 
 20
 Plaintiffs state further that AFT should have noted on the Stock Purchase Rights certificate that S.E.C. restrictions applied to the underlying stock. But neither the plain meaning of § 8-204--nor for that matter the Edina State Bank interpretation of it--provides that a disclosure of transfer restrictions that must appear on the face of one security must also appear on the face of another security, which a purchaser might acquire. Rather, § 8-204 applies only to the restricted security actually acquired by the purchaser, and requires that restrictions be "noted conspicuously thereon " or in an initial transaction statement. N.Y.U.C.C. § 8-204 (emphasis supplied); accord id. official uniform cmt. 2; see also Allen v. Biltmore Tissue Corp., 2 N.Y.2d 534, 540, 161 N.Y.S.2d 418, 141 N.E.2d 812 (1957) (discussing parallel provision in the Uniform Stock Transfer Act).
 
 
 21
 AFT noted on the face of each of the Stock Purchase certificates that "[t]his stock purchase right is transferable only with the consent of the Company." We need not address on this appeal whether this disclosure of the restrictions applicable to the warrants themselves--as opposed to restrictions applicable to the underlying common stock--was adequate under N.Y.U.C.C. § 8-204 and federal securities laws because the Brass conversion claim is based solely upon "the failure of AFT to provide warrants covering unrestricted shares " of AFT common stock, and the district court did not directly decide any other conversion issues. See Brass, 780 F.Supp. at 1003. Thus, AFT's failure to disclose the S.E.C. mandated restrictions does not subject it to suit for conversion and plaintiffs' causes of action on that theory are foreclosed as a matter of law.
 
 B. Contract Claim
 
 22
 1. Rules of Interpretation. Plaintiffs maintain this case involves two contracts: one between Brass and Dennis Abert to purchase 65,000 warrants, and another between AFT and the holders of the Stock Purchase Rights, now the Brass transferees, to receive unrestricted AFT common stock. They contend AFT breached the second contract. They assert that because the language of the Stock Purchase Right is consistent with Brass' claim that he thought he was purchasing warrants for unrestricted shares, which AFT now refuses to issue, a breach of contract has been alleged. The trial court's grant of summary judgment to AFT on this claim was in error, plaintiffs believe, because at best this second contract is ambiguous. See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir.1990); Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 172, 350 N.Y.S.2d 895, 305 N.E.2d 907 (1973).
 
 
 23
 Contracts are interpreted under well-settled rules that aid in determining the intent of the parties drawn from the language they chose to use. See Hartford Accident, 33 N.Y.2d at 171-72, 350 N.Y.S.2d 895, 305 N.E.2d 907; Cable Science Corp. v. Rochdale Village, Inc., 920 F.2d 147, 151 (2d Cir.1990). Where the language is plain and unambiguous, a court may construe the contract and grant summary judgment. See Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 427 (2d Cir.1992). Even where some ambiguity lurks in the language of the contract, a court may still construe the contract, if it can do so without reference to extrinsic circumstances or evidence. Where the resolution of the ambiguity hinges on such extrinsic matters as the credibility of witnesses or documents or upon choosing one among several reasonable inferences that may be drawn from such extrinsic evidence, a jury, and not a court, should decide what meaning is to be ascribed to the contract. See Hartford Accident, 33 N.Y.2d at 172, 350 N.Y.S.2d 895, 305 N.E.2d 907; accord Antilles S.S. Co. v. Members of the Am. Hull Ins. Syndicate, 733 F.2d 195, 207 (2d Cir.1984) (Newman, J., concurring). In such case, summary judgment is inappropriate. See Seiden Assocs., 959 F.2d at 428; Cable Science Corp., 920 F.2d at 151 ("only where the language and the inferences to be drawn from it are unambiguous" may a district court grant summary judgment).
 
 
 24
 Whether an ambiguity exists in a contract is a threshold question of law to be resolved by the court. See Curry Rd. Ltd. v. K Mart Corp., 893 F.2d 509, 511 (2d Cir.1990); Van Wagner Advertising Corp. v. S & M Enters., 67 N.Y.2d 186, 191, 501 N.Y.S.2d 628, 492 N.E.2d 756 (1986). Ambiguous language is that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Walk-In Medical Centers, Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir.1987). Straining a contract's language beyond its reasonable and ordinary meaning does not create an ambiguity. See Seiden Assocs., 959 F.2d at 429. Nor may an ambiguity be found where the contract has a definite meaning, and where no reasonable basis exists for a difference of opinion about that meaning. See Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989).
 
 
 25
 2. Rules Applied. Plaintiffs correctly note that the Stock Purchase Rights--the rights representing warrants--constitute a contract between them and AFT. Warrants are simply "a contract by which the corporation gives an irrevocable option to the holder to purchase authorized corporate stock within a period of time at a price and upon terms specified in the contract." Tribble v. J.W. Greer Co., 83 F.Supp. 1015, 1022 (D.Mass.1949); accord 4 Charles R.P. Keating, Fletcher Cyclopedia of the Law of Private Corporations § 1370 (Perm.Ed.1985). According to the terms of the rights or warrants contract, plaintiffs are entitled to purchase 32,500 shares of AFT common stock at $4 per share (prior to the reverse stock split, there were 65,000 warrants at $2 a share), subject to restrictions and covenants set out in four paragraphs labeled "statement of rights holders." The first of these paragraphs provides that AFT "covenants that, while the rights are exercisable, it will reserve from its authorized and unissued common stock a sufficient number of shares" to satisfy the exercise of the rights. Significantly, this covenant and the other three paragraphs do not mention that the common stock to be acquired is subject to a transfer restriction under S.E.C. Rule 144. AFT declares that nothing in the language of the rights contract creates an obligation on its part to provide plaintiffs with unrestricted common stock.
 
 
 26
 We agree that there is nothing said in the contract about restricted or unrestricted common stock. Yet this lack, we think, makes its language not so clear and definite as to be susceptible only to one reasonable reading. The key language is AFT's covenant to reserve from its "authorized and unissued common stock" adequate shares to satisfy the Stock Purchase Rights. In its February 28 opinion, the district court read this phrase and concluded that nothing in it "indicates that the stock at issue will be unrestricted and freely transferable." At the same time it seems equally true that nothing in this phrase indicates that the stock will be encumbered. In fact, given the general assumption that securities are free of adverse claims, see N.Y.U.C.C. § 8-204 uniform official cmt. 2, a reasonable person reading this phrase would not know that the stock being purchased, to which this language refers, is restricted.
 
 
 27
 For that reason we think there is an ambiguity in this phraseology that cannot be resolved without reference to extrinsic evidence. When what the parties intended cannot be "definitely and precisely gleaned" from a reading of the contract, Seiden Assocs., 959 F.2d at 430, they should be afforded an opportunity to present extrinsic evidence to establish their intent. Accordingly, we must reverse the district court's grant of summary judgment to AFT on plaintiffs' contract claim and remand this cause of action for the receipt of extrinsic proof.
 
 II Motion to Dismiss
 
 28
 We review de novo the grant of AFT's motion to dismiss plaintiffs' fraud claim. See Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir.1991). When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit. See Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47-48 (2d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). A complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).
 
 A. Duty to Disclose
 
 29
 The basis for dismissal of the instant complaint was its failure to state a claim for either fraudulent misrepresentation or fraudulent concealment with respect to either Brass or his transferees. On appeal plaintiffs do not appear to contend that the district court erred in dismissing the claims of the transferees, nor do they argue that there was any affirmative misrepresentation by AFT to Brass. Rather, they assert that AFT, through its chief executive Jensen, had an affirmative duty to disclose to Brass that the warrants and the underlying stock involved in his transaction with Abert were restricted and that Jensen's silence when he had a duty to speak was tantamount to fraud.
 
 
 30
 A duty to speak cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well. See, e.g., Moser v. Spizzirro, 31 A.D.2d 537, 537, 295 N.Y.S.2d 188 (2d Dep't 1968), aff'd, 25 N.Y.2d 941, 305 N.Y.S.2d 153, 252 N.E.2d 632 (1969); Perin v. Mardine Realty Co., 5 A.D.2d 685, 685, 168 N.Y.S.2d 647 (2d Dep't 1957), aff'd, 6 N.Y.2d 920, 190 N.Y.S.2d 995, 161 N.E.2d 210 (1959). New York recognizes a duty by a party to a business transaction to speak in three situations: first, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth, see Junius Constr. Corp. v. Cohen, 257 N.Y. 393, 400, 178 N.E. 672 (1931) (Cardozo, J.); second, when the parties stand in a fiduciary or confidential relationship with each other, see Allen, 945 F.2d at 45; and third, "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A., 731 F.2d 112, 123 (2d Cir.1984); accord Young v. Keith, 112 A.D.2d 625, 627 (3d Dep't 1985). Plaintiffs do not contend the defendant made a partial or ambiguous statement to Brass, so we need not discuss the first situation and consider only the other two possibilities.
 
 
 31
 1. Informal Trust Relationship. Brass asserts that Jensen owed him a duty of full disclosure with respect to the warrant transaction because there existed an "informal" relationship of trust between Jensen and him. We previously have observed in looking to New York law that a fiduciary relationship embraces not only those the law has long adopted--such as trustee and beneficiary--but also more informal relationships where it can be readily seen that one party reasonably trusted another. Examples of such informal fiduciary relationships found in the writings of scholarly commentators include priest and parishioner, bank and depositor, majority and minority stockholder, and close friends or family members. See W. Prosser, Handbook of the Law of Torts § 106, at 697 (4th ed. 1971) (citing cases); Restatement (Second) of Torts § 551 cmt. f (1977). Employing this broad definition, we held a fiduciary relationship might well have existed between executives of a subsidiary of WestPoint-Pepperell and the corporate entity. See Allen, 945 F.2d at 45.
 
 
 32
 But Brass does not point to and we are unable to find any cases in New York or other jurisdictions that have found an informal relationship of trust in a situation like the one at hand, where a sophisticated prospective investor attends a sales meeting with a heretofore unknown corporate officer. There is no reason to expand the class of informal fiduciary relationships to include these parties participating in such an arms-length transaction. Hence, Jensen had no informal fiduciary duty towards Brass that would have required him to make full disclosure of the stock restrictions.
 
 
 33
 2. Superior Knowledge. Plaintiffs next contend that Jensen had a duty to speak because of his superior knowledge with respect to AFT's securities. Superior knowledge standing alone, AFT tells us, imposes no duty to speak; such knowledge must also not have been readily available. See Aaron Ferer, 731 F.2d at 123. It is conceded that Jensen had vastly superior knowledge than Brass about the corporation's securities. Defendant declares instead that because knowledge of the S.E.C. Rule 144 restriction on its securities was readily available to plaintiff by contacting the Securities and Exchange Commission, Jensen owed Brass no duty to disclose the restraint on alienation.
 
 
 34
 AFT reads the phrase "readily available" too broadly. In general where a buyer has an opportunity equal to that of a seller to obtain information, such information is "readily available," and the buyer is expected to protect himself in a business transaction. See Restatement, supra, § 551 cmt. k. Yet, in an increasing number of situations, a buyer is not required to conduct investigations to unearth facts and defects that are present, but not manifest. For example, a buyer is not expected to discover that a house is infested with termites, see Prosser, supra, at 698, a prospective investor is not required to uncover that an amusement center offered for sale will produce lower monthly income because it has been raided by the police for illicit activities on the premises, see Restatement, supra, § 551 cmt. 1, illus. 11, and a purchaser of a note from one who is not the maker is not expected to uncover facts showing the worthlessness of the paper on account of its maker's insolvency or because it has been paid. See Rothmiller v. Stein, 143 N.Y. 581, 592-93, 38 N.E. 718 (1894). In those sorts of circumstances a buyer may safely rely on the seller to make full disclosure.
 
 
 35
 The case at hand is somewhat unusual, for it does not fit comfortably within the above examples, and the New York courts have not addressed it. In deciding, as we must, whether the state courts would require disclosure, we observe a tendency in New York to apply the rule of "superior knowledge" in an array of contexts in which silence would at one time have escaped criticism. See Minpeco, S.A. v. Conticommodity Servs., Inc., 552 F.Supp. 332, 337 (S.D.N.Y.1982); Noved Realty Corp. v. A.A.P. Co., 250 A.D. 1, 5, 293 N.Y.S. 336 (1st Dep't 1937). "It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when ... he would reasonably expect a disclosure." Gaines Serv. Leasing Corp. v. Carmel Plastic Corp., 105 Misc.2d 694, 697, 432 N.Y.S.2d 760 (N.Y.Civ.Ct.1980), aff'd without opinion, 113 Misc.2d 752, 453 N.Y.S.2d 391 (N.Y.App.Term.1981). New York has joined other jurisdictions in limiting the "privilege to take advantage of ignorance," Restatement, supra, § 551 cmt. 1; accord Chiarella v. United States, 445 U.S. 222, 247-48, 100 S.Ct. 1108, 1124, 63 L.Ed.2d 348 (1980) (Blackmun, J., dissenting), and has rejected "the dubious business ethics of the bargaining transactions with which deceit was at first concerned," Prosser, supra, at 696; accord Gaines Serv., 105 Misc.2d at 697, 432 N.Y.S.2d 760.
 
 
 36
 Taking the facts alleged in the amended complaint as true, we believe that AFT was duty bound under the superior knowledge rule to disclose to Brass the restrictions on alienability. Jensen, the statutory underwriter selling AFT securities to the public, met with Brass in April 1987 for the sole purpose of enticing him to purchase a substantial quantity of securities. To this end, Jensen emphasized the favorable prospects for film colorizing technology and informed Brass that AFT was selling warrants to purchase common stock that would rise in value. Over the course of the next two years, AFT through Jensen continued this solicitation, forwarding to Brass general literature and specific documentation regarding the warrants that Brass had acquired from Abert. None of these papers disclosed the restrictions on either the Brass warrants or the underlying common stock.
 
 
 37
 This case can be analogized to Donovan v. Aeolian Co., 270 N.Y. 267, 200 N.E. 815 (1936), where plaintiff sued a manufacturer of pianos for rescission of a contract of sale. The manufacturer had placed a used and partially rebuilt instrument on its showroom floor. Plaintiff saw the rebuilt piano, and believing it to be new, she purchased it. At trial, the plaintiff admitted that the piano salesman never made any representations to her about the age of the piano. Despite the salesman's silence, it was held that the manner in which this instrument was displayed implied that it was new, and the manufacturer's action thereby constituted a fraud. Id. at 270-71, 200 N.E. 815. Here Jensen's conduct taken as a whole--especially his representations to Brass about the upward potential of AFT's securities on the open market--strongly implied that the stock to be obtained upon exercise of the warrants purchased from Abert could be freely traded.
 
 
 38
 AFT distinguishes its case from Donovan because the piano manufacturer knew the buyer was acting under the belief that the instrument was new, while here plaintiffs have not alleged that AFT was similarly on notice about Brass' ignorance. AFT correctly states that a fraudulent concealment claim based on superior knowledge must allege that the defendant "knew that the plaintiff was acting under a mistaken belief with respect to a material fact." Frigitemp Corp. v. Financial Dynamics Fund, Inc., 524 F.2d 275, 283 (2d Cir.1975); accord Aaron Ferer, 731 F.2d at 123. AFT incorrectly insists that plaintiffs have not claimed they gave defendant such notice: the amended complaint sets out that Jensen knew of the restrictions and "also surely knew" that if Brass were informed of these restrictions, "Brass would never consider a purchase" of the securities. Under the circumstances, Jensen because of superior knowledge had a duty to tell Brass about the restrictions. Plaintiffs' complaint adequately pleads defendant's "notice" of Brass' ignorance to survive the motion to dismiss.
 
 B. Scienter
 
 39
 As the district court stated, a claim of fraudulent concealment must allege not only (1) that the defendant failed to meet its duty to disclose, but also (2) that the defendant had an intent to defraud or scienter, (3) there was reliance on the part of the plaintiff, and (4) damages. See Leasing Serv. Corp. v. Broetje, 545 F.Supp. 362, 366 (S.D.N.Y.1982). Because the district court found that AFT had no duty of disclosure, it did not address whether plaintiffs adequately asserted the other three elements of fraud.
 
 
 40
 AFT argues on this appeal that plaintiffs failed to allege scienter. We have held that "a complaint need only aver intent generally" and that "[t]o satisfy the scienter requirement, a plaintiff need not allege facts which show the defendants had a motive for committing fraud, so long as the plaintiff ... adequately identifies circumstances indicating conscious behavior by the defendants." Cosmas v. Hassett, 886 F.2d 8, 12-13 (2d Cir.1989). Plaintiffs' amended complaint alleges that Jensen met Brass to induce him to invest in AFT and concealed from Brass information regarding the restrictions on the securities because Jensen knew that this would lessen Brass' interest. This is sufficient to satisfy the scienter requirement.
 
 
 41
 Accordingly, the grant of AFT's motion to dismiss plaintiffs' amended complaint alleging fraud must be reversed with respect to Brass.
 
 CONCLUSION
 
 42
 The judgment of the district court is affirmed with respect to plaintiffs' conversion cause of action, and reversed with respect to plaintiffs' claims of breach of contract and Brass' claim of fraud. The matter is remanded to the district court for further proceedings on those claims in accordance with this opinion.